SLAVENS v. JAMES et al.   (No. 1429.)

(Court of Civil Appeals of Texas. Amarillo. April 9, 1919. Rehearing Denied May 14, 1919.)

1. PRINCIPAL AND AGENT ⟨⟩159(1)—BREACH —ACT OF AGENT.

Failure of agent to carry out terms of contract to buy cattle was a breach thereof, although principal had no knowledge that agent refused to accept and pay for cattle.

2. SALES ⟨⟩172—BREACH—POSSIBILITY OF PERFORMANCE.

The rights of an innocent seller in a contract of sale of cattle were not affected by fact that, after breach thereof by the opposite party, he disabled himself from performing by selling the cattle to another person.

3. SALES ⟨⟩92, 196—CONTRACT OF SALE—RESCISSION.

A telegram from seller in a contract of sale of cattle and buyer's reply thereto *held* neither a rescission of the contract nor a waiver by the seller of its breach.

4. SALES ⟨⟩196—BREACH—WAIVER.

Seller's efforts to assist buyer in a purchase of cattle by making terms less onerous should not be counted as a waiver of buyer's breach.

5. SALES ⟨⟩195 — CONTRACTS OF SALE — BREACH.

The failure of an agent to notify one who contracted to purchase cattle that he would not advance money and pay for cattle and accept them as agreed with the purchaser cannot be charged to seller so as to prevent seller from recovering for breach.

6. JUDGMENT ⟨⟩256(1)—FINDINGS—ACTUAL DAMAGE—PENALTY.

In action on a note deposited by defendant in a bank, to be forfeited if he should fail to accept certain cattle, a judgment for plaintiff was sustained where, in reply to defendant's answer that the note represented a penalty, plaintiff alleged and proved, and the court found, that actual damages resulting from defendant's refusal to take cattle were in excess of amount of the note, although court found that note represented a penalty, and not liquidated damages.

Appeal from District Court, Dallam County; W. E. Gee, Special Judge.

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by A. M. James and another against O. R. Slavens. From a judgment for plaintiffs, defendant appeals. Affirmed.

F. L. Martin, of Hutchinson, Kan., and R. E. Stalcup, of Dalhart, for appellant.

Tatum & Strong, of Dalhart, and C. E. Gustavus, of Amarillo, for appellees.

HALL, J. On the 10th day of August, 1911, appellees, a firm composed of A. M. James and Walter James, entered into a written contract with appellant for the sale of certain cattle. The material stipulations in the contract are as follows:

"And parties of the first part hereby sell to party of second part 1,700 to 1,800 head of three year old and up steers. * * * And second party agrees and contracts with parties of the first part to pay them for said cattle the price of $42 per head upon delivery as hereinafter mentioned, provided it shall be optional with the party of the second part whether he shall take a part or all of said cattle this fall at said $42 per head or next spring at the price of $45 per head. All of the cattle herein described are the cattle now situated on the ranch owned by parties of the first part, and the same as have been heretofore shown to party of second part, and the same shall be all good, merchantable, full-age cattle, and provided that party of the second part shall have the right to cut back 10 per cent. of said three year old steers upon delivery, and shall have the right to refuse same. Party of first part agrees to put in any bank that may be agreed upon by the parties hereto the sum of $5,000 as a forfeit, $2,500 for the four year olds, and $2,500 for the three year old steers above mentioned, and all the three year old steers above mentioned are to be delivered upon the cars at Dalhart, Tex., with proper bill of health, unless otherwise agreed upon, on or before November 1st, or next spring, as hereinbefore mentioned."

One paragraph of the contract provides for the sale of 1,300 to 1,500 four year old steers at $49 per head, with cut-back privilege of 10 per cent. at $47.50 per head. It was further agreed verbally that in lieu of the sum of $5,000 to be deposited in the bank as a forfeit, appellant should execute one note for $3,500, and a second note for $1,500. This second note is the basis of this suit. Plaintiffs allege in their original petition that they indorsed the note to the bank at Dalhart, and that the amount thereof was placed to their credit. Upon its maturity it was renewed several times, and finally, upon appellant's failure to pay it, the note was indorsed to them by the bank.

In his original answer defendant alleges: That prior to the 1st day of November, 1911, when under the contract the cattle were to be delivered and for a long time thereafter, he was seriously ill, and was confined to his bed at his home in Hutchinson, Kan., and was wholly unable to attend to any character of business. That on account of this condition, in order to carry out the terms of his contract, he procured the services of one Fremont Rogers to go to Dalhart, Tex., and receive the cattle for him in the manner and at the time provided in the contract. That at said time Rogers represented large financial institutions in Kansas City, Mo., and that defendant, prior to that time, through Rogers, had made arrangements to have the said Rogers pay the plaintiffs the full consideration for said cattle named in the contract, and closed the same in accordance with its terms, which facts were made known to plaintiffs when Rogers reached Dalhart. That when Rogers reached Dalhart, as well as on the 1st day of November, the plaintiffs had not performed or tendered performance of their contract by delivering to the defendant or his authorized agent at Dalhart the said cattle in accordance with the contract. That upon the arrival of Rogers there he began some kind of arrangements or negotiations with plaintiffs, the specific nature of which defendant is not advised, but the purport of which defendant charges to be either a modification of or a total rescission of the contract, and in pursuance thereof plaintiff A. M. James wrote the following telegram, procured Rogers to sign the same, and forwarded it to Hutchinson, Kansas:

"Dalhart, Texas, November 3, 1911. O. R. Slavens, Hutchinson, Kas. Theis did not buy steers. James proposes to brand cattle and leave them on ranch and carry you for $5,000.00 till spring. You to take cattle then and pay him note and $2.00 per head pasture, or he will keep cattle and pay amount borrowed. Think this best proposition under circumstances. Answer quick. Fremont Rogers."

That upon receipt of the telegram defendant immediately sent Rogers the following reply:

"Fremont Rogers, Dalhart, Texas. Better for him to keep cattle. Him pay amount borrowed. Impossible for me to do anything. Still confined to house. O. R. Slavens."

That by said telegrams the contract was mutually rescinded by the parties thereto. Wherefore the consideration for the note sued upon has wholly failed. On the following day Rogers wired appellant as follows:

"Don't fully understand your message. Do you want to accept James' proposition as wired last night? I can stay here and cut cattle if needed. Answer at Texhoma."

To which the appellant replied as follows:

"I don't want James cattle under any circumstances."

That on or about the 6th day of November, 1911, defendant received from Rogers a letter in substance as follows:

"His proposition was to give you six months' time on this note, charge you $2.00 per head for wintering the cattle and if you were not at that time in a position to take up your note of $5,000.00 and pay the pasture bill, Andy (James)

agreed to take up the paper held by the bank. This would give you all the chances to win and nothing to lose. As it stands now he holds your note for $5,000.00 and by your turning this proposition down he is going to collect it if possible. But on his proposition he was giving you six months' to handle the deal in, taking off $1.00 per head of the pasture price and giving you all of the profits, provided you should succeed in selling."

That upon receipt of said letter, on the 6th day of November, 1911, defendant wired Rogers as follows:

"Close deal with James Bros. according to your letter from Texhoma of November 4th. Send contract and note to be signed"

—and wired James Bros. as follows:

"Wired Rogers Texhoma close deal with you according to his letter of November 4th."

That some time between the sending of the first telegram and the sending by defendant of the last two telegrams above set out plaintiffs, without the knowledge of defendant, made other disposition of the cattle described in the contract, and asserted a claim to the forfeit of penalty. Defendant did not learn of the acts and intention of plaintiff until long thereafter.

Defendant alleges, as to the provision in said written contract that $5,000 was to be placed in the bank as a forfeit: That $2,500 was to be held on the four year old steers, and $2,500 on the three year old steers, and it was mutually understood at the time that such sums were a penalty and not liquidated damages. That at the request of plaintiffs, and for their benefit, the forfeit provided for in the contract was divided into sums of $3,500 and $1,500, respectively, so that plaintiffs could have the immediate use of said $1,500, and that the note executed for the said sum was placed in the bank for the convenience of and at the request of plaintiffs. That, when the contract as to the sale of the four year old steers was mutually rescinded, the provision for the forfeiture relating to same became null and of no effect, leaving in the contract only a provision for a forfeiture relating to the sale of the three year old steers in the sum of $2,500. That by the sale and transfer by plaintiffs to Fremont Rogers of the $2,500 note the plaintiffs have already received and have been already benefited under said contract, and particularly to the provision therein relating to a forfeiture on the three year old steers, in a sum greatly in excess of the said $2,500.

By supplemental petition plaintiff alleged, in substance: That they did not enter into any conspiracy with Fremont Rogers, and that after they had rounded up the cattle for delivery, waiting for defendant to notify them to place the cattle on the cars, a severe winter came on in the fall of 1911 before plaintiffs could arrange to get the cattle back to their various pastures, and provide proper feed, shelter, and protection for them, and as a result of the breach of the contract by defendant plaintiffs suffered a loss greatly in excess of the amount of the forfeiture provided for in said contract. They denied that they entered into any kind of a fraudulent contract with Rogers for the sale and disposition of the cattle, whereby they became indebted to him in any sum, and denied that they indorsed and delivered to him the note of $3,500 in consideration for any such transaction had between them and Rogers or any other person as a result of the sale or disposition of the cattle. That at the time defendant notified the plaintiffs of his intention to receive the cattle and to send his agent, Rogers, for that purpose, they had arranged to purchase additional cattle with which to stock their pasture; had placed a large sum of money in the bank as a forfeit to hold the cattle so purchased by them, expecting to pay the balance of the purchase price out of funds to be paid by defendant. That, after defendant refused to accept the cattle and declined to pay for them, plaintiffs were compelled to procure sufficient funds upon said cattle to enable them to pay for and receive the additional cattle purchased by them in contemplation of the sale to defendant. That plaintiffs at that time employed the said Fremont Rogers to assist them in procuring a loan upon the cattle which Slavens declined to receive and pay for, and as a consideration for his services transferred and delivered to him the said note of $3,500, but that the value of the service so rendered by Rogers to them would not have been worth more than $1,000. That plaintiffs did not release the defendant from the payment of the $5,000 provided for in the contract, but that prior to the time the defendant was to receive the four year old steers under the contract he informed plaintiffs that, on account of the money market and the decline in the price of the cattle, he was unable to receive the same or pay for them, but that he would receive said three year old steers and pay for them on the same terms provided for by the contract. Whereupon plaintiffs informed defendant that, if he would receive and pay for the three year old steers in accordance with the terms of the contract, they would release him from receiving and paying for the four year old steers, but that they did not consent to release him from the forfeit money put up and provided for by said contract. They denied that they had received the sum of $3,500 or the equivalent thereof on the three year old steers by reason of services rendered by the said Rogers, and that such services were rendered in a different transaction from that between plaintiffs and defendant. That it was understood that the $5,000 described as a forfeit in the contract should be considered as full compensation and as liquidated damages for the loss they would sustain in the event defendant breached the contract. That at no

time was said sum ever considered a penalty. That in the event it should be held that the $5,000 was intended as a penalty, then, by reason of the defendant's breach of the contract, they have suffered and sustained damages as the direct and proximate cause of such breach in a sum not less then $5,000.

A trial before the court without a jury resulted in a judgment against defendant in the sum of $2,527.42, being the amount of the principal, interest, and attorney's fees of the note sued upon.

In our original opinion we reversed and rendered the judgment upon the theory that the term of the contract relating to the sale of the four year old steers had been abrogated by mutual agreement. Upon a review of the record we find that we were mistaken in that conclusion.

The court found the contract in terms as hereinbefore set out; that after the execution of the contract by mutual agreement Slavens deposited in lieu of the $5,000 cash two notes, one for the sum of $1,500 and the other for the sum of $3,500, both maturing November 1, 1911; that the $1,500 note was indorsed by James Bros. and deposited in the bank, for which amount they received credit, and which said note was afterwards paid, and that this note is the basis of this suit. The remaining findings of the court relative to the matters urged in the brief are as follows:

"(5) That some time subsequent to the said 10th day of August, 1911, and prior to the 1st day of November, 1911, the said James Bros. agreed with said O. R. Slavens, in consideration of Slavens taking the three year old steers on or before November 1, 1911, at the price of $42 per head, to release him from the purchase of said four year old steers; that said Slavens agreed with said James Bros. in consideration for being released from receiving said four year old steers, that he would receive and pay for the said three year old steers on or before November 1, 1911.

"(6) That O. R. Slavens arranged with one Fremont Rogers to advance him the money with which to pay for the said three year old steers and to go to Dalhart, Tex., on the 1st day of November, 1911, to receive the said steers and pay James Bros., the plaintiffs, therefor.

"(7) That on or about the 2d day of November, 1911, the said Fremont Rogers, agent of the said O. R. Slavens, arrived in Dalhart, Tex., for the purpose of receiving the said three year old steers and paying James Bros. the purchase price of same.

"(8) That the said Fremont Rogers, as agent of said O. R. Slavens, went out and examined the said steers on the 3d day of November, 1911, and then informed A. M. James and W. P. James that he would not advance or pay the full purchase price at which said Slavens had agreed to pay for said steers, but would only advance the purchase price less the sum of $5,000.

"(9) That the failure and refusal of the said Fremont Rogers, agent of said O. R. Slavens, to receive the said steers and pay the full purchase price provided for by the terms of said written contract between said James Bros. and O. R. Slavens, was a breach of said contract on the part of the said O. R. Slavens.

"(10) That O. R. Slavens did not go to Dalhart, Tex., in person to receive and pay for said cattle, and sent no agent or other person there for said purpose save and except the said Fremont Rogers.

"(11) That after the said O. R. Slavens had breached the said contract through the acts of his agent, Fremont Rogers, James Bros. submitted to him through his agent, Fremont Rogers, a proposition whereby they would deliver the said steers to him at the purchase price provided for in said contract, but agreed to carry $5,000 of the purchase price of said cattle until the following spring and to pasture said cattle until the following spring at the sum of $2 per head; that this offer was submitted by said Fremont Rogers unto the said O. R. Slavens, and that said Slavens, after receiving said last-mentioned offer, repudiated entirely the said contract of sale between himself and the said James Bros., which repudiation occurred on the 4th day of November, 1911.

"(12) That after said repudiation, which was on November 4, 1911, communicated to James Bros., they considered the said contract with O. R. Slavens at an end for all purposes, and made other arrangements immediately thereafter as to a disposition of said cattle, which were covered by said contract.

"(13) That the said note of $1,500 described in the plaintiff's petition and the note of $3,500 described in defendant's answer, which were executed in lieu of the $5,000 cash provided for in said contract of sale, were put up by the said Slavens as a penalty, and not as liquidated damages.

"(14) That the actual damages sustained by James Bros. by reason of the said O. R. Slavens breaching the said contract was in excess of the sum of $5,000."

[1-6] Appellant's first assignment of error is in substance that the court erred in rendering judgment against him because the note sued upon was executed by defendant and intended by all parties as a penalty or forfeiture, when the pleadings and the great preponderance of the testimony shows the said contract was completely rescinded by mutual agreement of the parties. Wherefore the consideration for the note failed. Upon the motion for rehearing appellees have called to our attention the fact that there is sufficient testimony in the record to sustain the court's finding, and that the contract, and no part of it, had ever been rescinded on the first of November, 1911, or prior thereto. As found by the court, in the fifth subdivision of his findings, it was agreed after the execution of the written contract that, if Slavens would take the three year old steers on or before November 1st at the price of $42 per head, instead of exercising his option to take them in the following spring, he would be released from his obligation to take the four year old steers on November 4th. This modification of the term of the contract with reference to the four year old steers was based upon the consideration that Slavens would receive and

pay for all of the three year old steers on or before November 1st. It appears from the record that prior to November 1st Slavens had been confined to his bed in his home in Kansas by a severe illness; that he had previously intimated to James Bros. that he might not be able to comply with his contract, but later, and before the 1st day of November, had informed them that Rogers, who represented a commission company from which Slavens expected to obtain the money with which to pay for the steers, would be in Dalhart about November 1st, and receive and pay for the three year old steers according to the contract as modified. While it is true that Slavens believed that Rogers would actually receive and pay for the steers, it is equally true that, when Rogers arrived at Dalhart and inspected them, he decided not to receive them, but did not notify his principal, Slavens, of such decision. His failure, as Slavens' agent, to carry out the terms of the contract as modified, was a breach thereof. It appears that prior to this time some of the four year old steers had been shipped out by James Bros. They did this with the knowledge and consent of Slavens, relying upon his promise to take and pay for the three year old steers on or before November 1st. The rights of an innocent party to a contract will not be affected by the fact that after a breach thereof by the opposite party the innocent party has disabled himself from performing. 6 R. C. L. p. 1020, § 381. We think the evidence is sufficient to sustain the court's finding that the contract was breached by the failure of Rogers to accept and pay for the cattle on November 1st.

It is not necessary for us to hold that the nature of the contract and the circumstances surrounding it made time of its essence. It was shown, however, that James Bros. had made a cattle deal of considerable importance with parties residing in New Mexico, and had up about $30,000 as a forfeit, guaranteeing his performance on or before November 10th; that he had informed Slavens of these facts and had told him more than once he was anxious to close this deal in order that he might have the funds to consummate his trade with the parties in New Mexico. It was further shown that the price of cattle had been declining rapidly since the execution of the contract between the parties thereto on the 10th day of August. These and other circumstances tend to show that, if time was not of the essence of the contract, Slavens had knowledge of the importance of its fulfillment on his part by November 1st. Appellant insists that the telegrams and letters passing beween Rogers and James, on the one part, and Slavens, on the other, immediately after the 1st of November, show a rescission of the contract, or at least a waiver of the breach. It appears that when Rogers went to Dalhart to receive the cattle he carried a prospective purchaser by the name of Theis, who, after inspecting the cattle, decided not to take them. Bearing this fact in mind, and the further facts that when that telegram was sent Rogers had declined to accept and pay for the three year old cattle for Slavens, that under the original contract Slavens was to pay $3 per head additional if he did not take the three year old cattle on the 1st of November, that James had borrowed money upon the cattle as security, the information imparted by that telegram is that Theis had decided to buy the three year old steers, and, because Rogers had not accepted them, James, with a view of enabling Slavens to finally take the cattle, proposed to brand them in Slavens' brand, care for them on his ranch until spring, hold the two notes, amounting to $5,000, until then, and at that time permit Slavens to take the cattle and pay the notes, and pasturage at the rate of $2 per head. He further proposed, in the alternative to keep the cattle and pay the amount which he (James) had borrowed on them. We believe this is a fair interpretation of the language of that telegram. Its purport seems to have been misunderstood by Slavens. By the language "and pay amount borrowed" Slavens evidently understood the reference to be to the $1,500 which James had borrowed upon the note sued on by indorsing it to the bank. He accordingly wired Rogers that it was better for James to keep the cattle and pay that amount, accepting the last proposition in the telegram as he understood it. On the following day Rogers wired Slavens that he did not understand his message and asked him if he cared to accept James' proposition as wired the night before, and proposing to Slavens to stay there and cut the cattle if he was needed. Believing that the effect of the telegrams was to rescind the contract, Slavens wired he did not want James' cattle under any circumstances. We do not assent to the proposition that the effect of the first telegram and Slavens' reply thereto was either a rescission of the contract or a waiver of its breach. Having breached the contract, Slavens had no right to rescind; nor do we think that James' efforts to assist Slavens in his purchase of the cattle by making the terms less onerous should be counted as a waiver of the breach. As said in 2 Mechem on Sales, §§ 1071, 1073, and 1074:

"A waiver is the voluntary and intentional relinquishment of a known right. It implies an election by the party to dispense with something of value or to forego some advantage which he might, at his option, have demanded or insisted upon. To constitute a waiver, therefore, the acts relied upon must have been intentionally done with knowledge of the facts, and the party acting must have been in such a situation of freedom to choose that his relinquishment can fairly be said to have been voluntary. What one does in a dilemma forced upon him by the default of another cannot be counted upon as a waiver. So mere leniency on the part of him to whom the act is due—

mere voluntary indulgence in not insisting upon performance—does not constitute a waiver. It cannot be justly construed as a permanent waiver of the default or as implying any agreement to waive it, or to continue the same indulgence for the time to come. Again, the mere fact that the party entitled has attemped by offers or proposals not accepted to adjust the matter, or make new arrangements, or vary the terms, does not constitute a waiver of the default to rob him of any of the rights which have accrued to him thereby under the contract."

The same rule is expressed in 3 Elliott on Contracts, pp. 237, 238, in the way:

"But a right under a contract is not ordinarily waived by making an honest effort to induce compliance therewith by the party who seeks to avoid such compliance"—citing a number of authorities. .

In Black on Rescission and Cancellation, vol. 1, § 220, we find this doctrine:

"When a contract fixes a specific time for performance, or for completion of the work, and contains a condition by which a certain sum is to be forfeited, or a per diem penalty imposed, if the contracting party fails to perform, or to complete by the day appointed, this is regarded as making time of the essence of the contract, so that on default of punctual performance or completion a rescission of the contract will be justified."

While the author evidently used the language as announcing the rule with reference to building contracts, we think it is applicable in some measure here. See, also, Id. § 216.

"After the breach of a contract the rights of an innocent party are not affected by an offer to perform by the party who is in default." 6 R. C. L. p. 1020, § 381.

The fact that on the 6th of November Rogers wrote Slavens, fully explaining the meaning of the first telegram, and that Slavens at once wired both Rogers and James that he would accept the terms proposed, does not affect the question. Both the original contract and the contract as modified had been breached, and at the time these two telegrams were sent James had made other arrangements with reference to the cattle described in the contract, and it was beyond his power to perform. The failure of Rogers to notify Slavens that he would not pay for the cattle and accept them cannot be charged to James Bros. In this particular Rogers was acting as agent of Slavens. While it is not necessary for us to decide the point, we incline to the opinion that he was also the agent of Slavens in receiving from James Bros. the first telegram containing the alternative propositions. In transmitting it to Slavens, he evidently considered himself to be still acting for Slavens, as he advised his principal to accept the last proposition. Under the court's finding numbered 14, to the effect that James Bros. had sustained actual damages by reason of the breach of the contract by Slavens in excess of $5,000, the judgment should be sustained, even though the court is correct in his finding numbered 13, to the effect that the $5,000 represented by notes was a penalty, and not liquidated damages, since there is evidence enough to sustain the finding of actual damages. We incline to the opinion, however, that the $5,000 was liquidated damages rather than a penalty. Yetter v. Hudson, 57 Tex. 604; Lipscomb v. Fuqua, 103 Tex. 585, 131 S. W. 1064; Eakin v. Scott, 70 Tex. 442, 7 S. W. 778; Millar v. Smith, 28 Tex. Civ. App. 386, 67 S. W. 429; Dobbs v. Turner, 70 S. W. 458; Shelton v. Jackson, 20 Tex. Civ. App. 443, 49 S. W. 416; Halff v. O'Connor, 14 Tex. Civ. App. 191, 37 S. W. 242.

There is no conflict in the findings of the court. Even though we should sustain this contention of appellant, the conflict would be with reference to immaterial matters, and the assignments upon this question are overruled.

We find no reversible error in the record. The motion for rehearing is granted, our former opinion is withdrawn, and the judgment is affirmed.

